**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CELESTE DAVID,**<br><br>               **Plaintiff,**<br><br>    **v.**<br><br>**BOARD OF TRUSTEES OF<br>COMMUNITY COLLEGE DISTRICT<br>NO. 508, d/b/a CITY COLLEGES<br>OF CHICAGO,**<br><br>               **Defendant.** | **Case No. 13 C 2508**<br><br>**Judge Harry D. Leinenweber** |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's Motion for Summary Judgment [ECF No. 16]. For the reasons stated herein, the Motion is granted.

### I. BACKGROUND

The following facts are undisputed except where noted. Plaintiff Celeste David ("David" or "Plaintiff") used to work for Defendant City Colleges of Chicago ("CCC"). David is an African-American woman who started with CCC in October 1980 and retired on June 30, 2012. She held various positions throughout her career, but at the time of her retirement, she was a "Manager of End User Services" in CCC's Office of Information Technology ("OIT"). David alleges that CCC paid her less than other similarly situated employees because of

her race, age, and gender, in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), and the Equal Pay Act.

The central facts in this case involve the year leading up to David's retirement. On August 1, 2011, David announced her intention to retire eleven months later on June 30, 2012. About a month after announcing her retirement, David met with Craig Lynch ("Lynch"), the "Vice Chancellor" of the OIT department and the person in charge of approving any promotions, job re-classifications, or pay increases. David asked Lynch for a different job title and more pay because she was performing what she describes as two jobs despite being paid only as a Manager of End User Services. In support of this request, David completed and submitted a Job Analysis Questionnaire, which is a form that CCC employees can fill out to request formally more pay or a different title. Lynch said he would look into it, but David's questionnaire was never submitted to Human Resources for review or approval. In the end, David stayed at the same pay and job title until her retirement.

About six months prior to retirement, David met with CCC's EEO officer, Aaron Allen ("Allen"), to file an internal EEO Complaint Form with CCC. In the form, David claims that

she met with Lynch on three different occasions to discuss her pay and title. On each occasion, according to David, Lynch referenced her impending retirement. CCC's internal EEO office confirmed receipt of David's complaint form on February 3, 2012, but Allen was unable to resolve the complaint before David retired in June.

David's complaint eventually wound its way through the EEOC and she received a right-to-sue letter on January 9, 2013, after which she timely filed her federal complaint. CCC now moves for summary judgment, arguing that David has not mustered sufficient evidence to establish discrimination and that, even if she did, there are valid, non-discriminatory reasons for any disparities in pay and treatment.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving

party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party satisfies its initial burden, the non-moving party must demonstrate with evidence "that a triable issue of fact remains on issues for which [it] bears the burden of proof." *Knight v. Wiseman,* 590 F.3d 458, 463–64 (7th Cir. 2009).

The judge's role at summary judgment is not to make credibility determinations or weigh the evidence. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007). In determining whether a genuine issue of material fact exists, the Court construes all evidence in the light most favorable to the non-moving party — in this case David. *See, Bellaver v. Quanex Corp.,* 200 F.3d 485, 491-92 (7th Cir. 2000).

### III. <u>ANALYSIS</u>

David's Complaint includes one count of age discrimination in violation of the ADEA, one count of race discrimination in violation of Title VII, one count of gender discrimination in violation of Title VII, and one count of wage discrimination in violation of the Equal Pay Act. Because the same analytical framework applies to Title VII and ADEA claims, the Court will consider those claims first. Next, the Court will consider David's Equal Pay Act claim.

## A. Title VII and ADEA Claims

Title VII prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Likewise, the ADEA prohibits employers from discriminating on the basis of a person's age. 29 U.S.C. § 23(a)(1).

In both Title VII and ADEA cases, a plaintiff may establish discrimination either directly or indirectly. *Atanus v. Perry,* 520 F.3d 662, 671 (7th Cir. 2008). The direct method does not necessarily require "direct evidence" of discriminatory intent; rather, it simply requires evidence that "points directly" to a discriminatory reason for the employer's action. *Id.* (internal quotation marks omitted). The indirect method involves application of the *McDonnel Douglas* shifting framework described more thoroughly below. *Id.* at 672.

Either method, however, requires proof of a materially adverse employment action, because "not everything that makes an employee unhappy is actionable." *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996). An employment action is materially adverse if it results in "a significant change

in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes v. Ill. Dep't of Trasnp.*, 359 F.3d 498, 504 (7th Cir. 2004).

CCC argues that the only actions that were materially adverse in this case are David's claims relating to pay and her non-promotion. Accordingly, CCC asks the Court to dismiss any claim based on (1) CCC's alleged failure to submit David's Job Analysis Questionnaire to CCC's Human Resources Department, and (2) CCC's failure to take action on David's EEO complaint before she retired. In response, David argues that CCC's failure to process her Job Analysis Questionnaire and her internal EEO complaint are materially adverse actions because they limited and deprived her of a better job title. David's arguments on this issue are devoid of citations to any legal authority, and the Court cannot find a case where similar conduct was found to be an adverse employment action. The failure to process the Questionnaire or the EEO complaint did not "cause a substantial change in [David's] benefits." *Id.* Instead, those failures are, at most, the vehicles by which CCC *did* engage in materially adverse employment actions — that is, CCC's denial of David's request for a better job

title and more pay.  The Court therefore finds that the only materially adverse employment actions in this case are CCC's refusal to give David a new job title and a pay increase.  With that in mind, the Court will discuss David's arguments under the direct and indirect methods in turn.

### *1. Direct Evidence of Discrimination*

The direct method of proving discrimination "requires the plaintiff to put forth evidence that demonstrates that she was a member of a protected class and '*as a result* suffered the adverse employment action of which [s]he complains.'"  *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006) (quoting *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006)).  This can involve direct or circumstantial evidence, and typical circumstantial evidence includes:

> "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Atanus*, 520 F.3d at 672 (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)).

There is no doubt that David, an African-American woman over forty, is a member of several protected classes. The issue is whether she was denied a better job title and more pay because of her age, race, or gender. David relies on remarks CCC employees made regarding her retirement as direct evidence of discrimination. According to David, remarks about her upcoming retirement are "evidence of [CCC's] view of [David], and how her age reflected how she was treated." (Pl.'s Mem. in Opp. to Def.'s Mot. for Summary Judgment at 5, ECF No. 27).

David is correct that a defendant's remarks may constitute direct evidence of discrimination if the remarks are made "around the time of, and . . . in reference to, the adverse employment action." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000). But the rule does not apply to all remarks. Rather, the remarks must come from those responsible for the adverse employment action or "those who provide[d] input into the decision." *Id.*

The only statements David relies on are those made by Lynch and a person named Kevin Williams ("Williams"), who appears to be the person responsible for assigning seats in the OIT department. David has presented no evidence that Williams had authority or provided input regarding her denied

pay increase and job title requests. Thus, the Court disregards any statements Williams made. *See, id.*

As to Lynch, David cites two occasions where Lynch commented on her retirement. The first statement was made in response to David's first request for a pay increase and title change, which David made after she had announced her plans to retire. According to David, Lynch responded to her request by asking, "[A]ren't you about to retire?" The second statement came two months later when David followed up with Lynch regarding her initial request. This time, David claims that Lynch flatly rejected her request, stating that David was about to retire and that her position was a low priority for him. David argues that these two statements demonstrate that Lynch denied her a pay increase and promotion because of her age. In response, CCC argues that those statements do not demonstrate any animus because "retirement is not a proxy for age" and that David's looming retirement was an appropriate factor to consider when deciding whether to grant David's requests.

CCC has the better argument here. Several courts have found that remarks related to retirement do not demonstrate animus based on age. For example, CCC's relies on *Nabat,* where the court considered the plaintiff's argument that

retirement-based remarks constituted direct evidence of age-based discrimination. *Nabat v. Aetna Cas. & Sur. Co.,* No. 92 C 945, 1993 WL 390373, at *3 (N.D. Ill. Sept. 30, 1993). The court found that none of the statements made reference to the plaintiff's age and they therefore could not provide direct evidence of discriminatory intent. *Id.* (citing *Finnegan v. Trans World Airlines, Inc.,* 767 F.Supp. 867, 876 (N.D. Ill. 1991), *aff'd,* 967 F.2d 1161 (7th Cir. 1992)). Like the statements at issue in *Nabat,* here none of the statements refer to David's age. Moreover, David's response does not address this argument or explain how cases like *Nabat* are distinguishable. Thus, the Court finds that Lynch's statements do not provide direct evidence of discrimination.

The remaining arguments in David's brief under the "direct evidence" heading largely overlap with other issues, such as pretext or the existence other similarly situated employees. None of these arguments "point directly" to a discriminatory reason for the employer's action. *Atanus,* 520 F.3d at 671. At most, they go to David's indirect evidence argument, which is discussed below. Thus, David has failed to present a genuine issue of material fact under the direct method, which leaves the indirect method as David's only hope for surviving summary judgment.

## *2. Indirect Evidence of Discrimination*

Under the indirect method of proving discrimination, a plaintiff must show that: "(1) she is of a protected class; (2) she is qualified for the position; (3) she was rejected for the position; and (4) the position was given to someone outside the protected class who was similarly or less qualified than she." *Hobbs v. City of Chicago,* 573 F.3d 454, 460 (7th Cir. 2009). If a plaintiff makes such a showing, then the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the" adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Finally, if a defendant can articulate nondiscriminatory reasons for its actions, then the burden shifts back to the plaintiff to prove that the defendant's reasons were merely a pretext for discrimination. *Id.* at 804.

As to David's initial burden, there is no doubt that she has satisfied the first and third elements; she is of multiple protected classes and CCC does not dispute that it denied her requests for a job title and pay increase. CCC focuses its challenge on the fourth element, arguing that David has not pointed to a similarly-situated employee that CCC treated better than her.

"An employee is similarly situated if the employee is 'comparable to the plaintiff in all *material* respects.'" *Warren v. Solo Cup Co.,* 516 F.3d 627, 630–31 (7th Cir. 2008) (quoting *Crawford v. Ind. Harboer Belt R.R. Co.,* 461 F.3d 844, 846–47 (7th Cir. 2006)). "The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors." *Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012). The relevant factors include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications - provided the employer considered these latter factors in making the personnel decision." *Warren,* 516 F.3d at 631 (internal quotation marks omitted).

These factors are not all-inclusive, however, and there is no "rigid, mechanized, or ritualistic" way of determining whether two employees are truly comparable. *Coleman,* 667 F.3d at 846. Instead, the Court must simply look at the employees and evaluate the available evidence "in light of common experience" to determine whether they are comparable. *Id.* Moreover, whether an employee is similarly situated is usually a fact question for the jury; thus, "summary judgment is appropriate only when no reasonable fact-finder could find

that plaintiffs have met their burden on the issue." *Id.* at 846–47.

Preliminarily, the Court notes that, although David's Complaint and interrogatory answers name several employees who allegedly received preferable treatment, David's summary judgment briefing and related statement of facts refer to only two employees: Christopher Reyes ("Reyes") and Rosane Rodriguez ("Rodriguez"). Consequently, those are the only employees the Court will consider. The starting point for this analysis is to consider David's role and qualifications before retirement in order to compare her to Reyes and Rodriguez.

David retired as a Manager of End User Services. At the time of her retirement, David's highest level of education was a high school diploma. CCC's job description for David's position lists under "Qualifications" the following: "Bachelor's Degree in Computer Science, Information Science, Computer Information Systems, Data Processing, or an appropriate related field." (Def.'s L.R. 56.1 Stmt. Ex. M, ECF No. 18). In lieu of having such a degree, however, the description explains that "[a] combination of educational and work experience may be taken into consideration at the discretion of the administration." (*Id.*). David described her

day-to-day job duties as compiling certain reports, supervising help desk and technical personnel, and eventually overseeing "PeopleSoft security," which involved providing users access to PeopleSoft and developing that program "as related to security." (Pl.'s Dep. 17:8–24:17 (May 29, 2014), Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., Ex. B, ECF No. 38).

In 2001, CCC hired Reyes, a younger Asian male who worked for Sync Solutions as an IT consultant. As an outside consultant, Reyes assisted David in her PeopleSoft security duties until 2011, when CCC hired Reyes from Sync Solutions as a full-time Functional Applications Analyst ("App Analyst"). Reyes has a Bachelor of Science degree in Computer Information Systems, which is a prerequisite for CCC's App Analyst position. In his new position, Reyes performed "totally different" duties than what he performed while working for CCC as a Sync Solutions consultant. (Reyes Dep. 25:10–14 (Sept. 3, 2014), Def.'s L.R. 56.1 Stmt., Ex. K, ECF No. 18). Rather than working exclusively on PeopleSoft security, Reyes's new position had him working on PeopleSoft administration, which involved setting up tuition amounts and registration information. During the month when Reyes transitioned into his new job as an App Analyst, Reyes split his time between doing PeopleSoft security duties with David

and his newly acquired PeopleSoft administration duties. After that transition period, however, Reyes stuck strictly to PeopleSoft administration duties, while David performed all the security duties.

When David retired, Reyes took over at least some of David's duties without receiving any additional pay. Then, in December 2012, CCC promoted Reyes to a Senior Security Analyst ("Senior Analyst") at a yearly salary of $93,808.00, which is substantially more than David earned at the time of her retirement. Although the Senior Analyst title was newly created for Reyes, the parties dispute whether the position was truly new. David argues that Reyes is simply doing her old job but with the better title and higher pay that David asked for before she retired. CCC argues that Reyes is doing more than David did in her old role, and that it created the new position to reflect Reyes's superior education. Either way, the Senior Analyst job description lists under "Qualifications" the following: "Bachelor of Arts (BA) or Bachelor of Science (BS) degree in Computer Science or equivalent, supplemented by 7 years related experience with systems analysis, design, software support and application of security controls." (Def.'s L.R. 56.1 Stmt. Ex. I-9, ECF No. 18). Unlike the job description for David's position,

however, the Senior Analyst description includes no provision that would allow experience to replace the requirement of a college degree.

Rodriguez was hired as a Technical Applications Developer a couple of years after David retired. That position requires a Bachelor of Arts or Science degree in a particular field, which Rodriguez possesses. As a Developer, Rodriguez assists Reyes with PeopleSoft security duties, similar to what David did before she retired. In addition to PeopleSoft security, Rodriguez also helps Reyes in developing "the interaction hub." (Def.'s L.R. 56.1 Stmt. ¶ 66, ECF No. 18). CCC paid Rodriguez substantially more than it paid David just prior to retirement.

CCC argues that Reyes and Rodriguez are not sufficiently similar to David to count as comparable employees for Title VII and ADEA purposes. This is so, CCC argues, because Reyes and Rodriguez both have college degrees and worked in positions that required such degrees, whereas David only has a high school diploma and did not work in a position that strictly required a college degree. CCC also argues that Reyes and Rodriguez performed additional and different duties than David, making them incomparable. Finally, CCC notes that David has not pointed to any employee in her similar

circumstances that received better treatment — that is, David has presented no evidence of another younger, non African-American male employee who received better treatment after announcing his intention to stop working for CCC.

The Court finds that there is too much undisputed evidence of dissimilarity between David and her proposed similarly situated employees to allow any reasonable jury to find them truly comparable. David did not dispute any of the facts that demonstrate the above dissimilarities. For example, David has admitted that Reyes and Rodriguez have college degrees while she does not, which alone has been found to disqualify an employee as similarly situated. *See, Boriss v. Addison Farmers Ins. Co.,* No. 91 C 3144, 1993 WL 284331, at *10-11 (N.D. Ill. July 26, 1993). Thus, even if Reyes was hired simply to replace David, Reyes's superior education makes him incomparable. David has also admitted that Reyes and Rodriguez performed duties that David never performed. (Pl.'s Resp. to Def.'s L.R. Stmt. ¶¶ 65-66, ECF No. 28). Reyes and Rodriguez both work in part on developing "the interaction hub," and David has presented no evidence that she did similar work.

David makes much of the fact that Reyes and another manager, Jackson, thought that Reyes was applying for David's

"old job." According to David, these statements constitute evidence that Reyes was simply doing David's job, but with better pay. It does not matter, however, that Reyes thought he would be taking David's old job, because the record is clear that in addition to doing that job, he performs other duties and has an education that David does not.

Finally, David has not pointed to any employee who was treated differently despite being in her similar circumstances. The record contains no evidence of an employee outside David's class who announced that he was leaving and yet received better treatment than David. In sum, David has not mustered sufficient evidence to establish that similarly situated employees were treated differently, which is an essential element in proving indirect discrimination. This failure is fatal to David's indirect discrimination claim, and because David has not established a *prima facie* case for either direct or indirect discrimination, her Title VII and ADEA claims fail.

### B. Equal Pay Act claims

The only remaining claim is David's Equal Pay Act claim. To establish a *prima facie* case for claims under the Equal Pay Act, a plaintiff must satisfy three criteria: "First, plaintiff must show that 'different wages are paid to

employees of the opposite sex.' Second, plaintiff must show that she did 'equal work which requires equal skill, effort and responsibility.' Third, plaintiff must show that the employees 'have similar working conditions.'" *Boriss,* 1993 WL 284331, at *4 (quoting *Fallon v. Illinois,* 882 F.2d 1206, 1208 (7th Cir. 1989)). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to show by a preponderance of the evidence that the pay disparity "is due to one of four factors. These factors are (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production or (4) any other factor other than sex." *Id.* (internal quotation marks omitted). A "factor other than sex" need not be related to the particular requirements of the job in question. *Fallon,* 882 F.2d at 1211. In fact, the non-sex factor need not be business-related at all. *Id.*

In this case, even assuming that David has established a prima facie case under the Equal Pay Act, that claim must fail based on the facts that doom David's Title VII and ADEA claims. As noted above, CCC has presented an undisputed factor other than sex that justifies a disparity in pay — namely, Reyes's college degree. *See, Boriss,* 1993 WL 284331, at *9. Moreover, CCC appears to pay both men and women more for

having a college degree, as shown by the undisputed facts that CCC paid both Reyes (a man) and Rodriguez (a woman) more than David. These undisputed facts satisfy CCC's burden of coming forward with a factor other than sex that explains the complained-of pay disparity. Thus, David's Equal Pay Act claim also fails.

## IV. <u>CONCLUSION</u>

For reasons stated herein, CCC's Motion for Summary Judgment [ECF No. 16] is granted.

**IT IS SO ORDERED.**

                                                Harry D. Leinenweber, Judge
                                                United States District Court

Dated:4/24/2015